# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| METROPOLITAN BANK AND TRUST COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>PACIFIC BUSINESS CAPITAL CORPORATION,, *et al.*,<br><br>    Defendants.<br><br>PACIFIC BUSINESS CAPITAL CORPORATION,<br><br>    Counter-claimant,<br><br>v.<br><br>METROPOLITAN BANK & TRUST COMPANY,<br><br>    Counter-defendant. | Case No. 2:01-cv-622-LDG (LRL)<br><br>**ORDER** |

      Metropolitan Bank and Trust Company (Metropolitan) brought this action in state court, naming Pacific Business Capital Corporation (PBCC), Desert Valley Mobile Homes, LLC, and Desert Valley Financial, LLC, as defendants. Metropolitan's complaint alleged

two claims: (1) that the defendants intentionally interfered with its contractual relations with its customers, and (2) that the defendants converted Metropolitan's personal property. The defendants removed the action to this court.

After removing this matter, PBCC filed counterclaims against Metropolitan for (1) conversion, (2) claim and delivery, (3) interference with contract, (4) an accounting, (5) a constructive trust, (6) injunctive relief, (7) appointment of a receiver, and (8) declaratory relief. This matter was tried to the court beginning February 27, 2007. Following five days of receiving evidence, the parties submitted post-trial briefs, and gave closing arguments on May 24, 2007.

During the trial of this matter, Metropolitan abandoned both of its claims.

PBCC prosecuted its claims, and is entitled to judgment as to its claim of conversion. Summarized briefly, PBCC met its burden, and Metropolitan did not dispute, that PBCC perfected a senior security interest in the subject chattel paper. Conversely, Metropolitan did not meet its burden of showing that, pursuant to either U.C.C. §9-306(b) or U.C.C. §9-308(a), the sale and Metropolitan's purchase of the chattel paper extinguished PBCC's perfected, senior security interest. Metropolitan subsequently exercised unlawful dominion and control over the chattel paper.

The following constitutes the Findings of Fact and Conclusions of Law on PBCC's counterclaims.

Silver State Mobile Homes (Silver State) sold mobile homes to consumers. In connection with the sale of a mobile home to a consumer, Silver State and the consumer executed a "Manufactured Home Retail Installment Contract and Security Agreement" (Mobile Home Loan Contract). Galaxy Financial Services, Inc. (Galaxy) financed the Mobile Home Loan Contract, and Silver State assigned the Mobile Home Loan Contract to Galaxy.

In September 1997, Silver State and Galaxy began a financing relationship with PBCC. Effective September 19, 1997, Silver State and Galaxy executed an Amended and Restated Security Agreement (the "Amended Security Agreement) in favor of PBCC. Section 3.4 of the Amended Security Agreement provided that Silver State and Galaxy would

> "[n]ot sell, contract to sell, lease, contract to lease, encumber, transfer, assign, hypothecate or permit or suffer any Lien (other than the Liens created or otherwise permitted hereby) or judgment or other judicial or involuntary lien against, or otherwise convey or dispose of, the Collateral or any part thereof or interest therein except in the ordinary course of business, without the prior express written consent of [PBCC] which may be withheld for any reason whatsoever.

During the period of September 19, 1997, through March 6, 2000, PBCC, Galaxy Financial and Silver State Mobile Homes entered into thirty Secured Promissory Notes and Pledge Agreements, and an additional eleven Secured Promissory Notes that were renewals of previously executed Secured Promissory Notes. Each Pledge Agreement provided:

> In consideration of the financial accommodations given by [PBCC], [Silver State and Galaxy] hereby grants to [PBCC] a security interest in all of the Manufactured Home Retail Installment and Security Agreements, together with all security interests granted and held thereunder, now owned or hereafter acquired by [Silver State and Galaxy] (the "Collateral"). The Collateral includes, but is not limited to, the Manufactured Home Retail Installment and Security Agreements listed in Exhibit "A" attached hereto and incorporated herein by this reference. The Collateral further includes and shall be increased by any and all payments, interest, and other earnings, upon or from the Collateral described hereinabove, hereafter payable before the obligations secured by this Security Agreement are satisfied in full.

The Pledge Agreements further provided, in Paragraph 2(f) that:

> [Silver State and Galaxy] will not sell, transfer, hypothecate or permit or suffer any attachment, judgment or other judicial or involuntary lien against any asset owned by [Silver State and Galaxy] . . . .

Paragraph 10(j) of the Pledge Agreements provided that:

> [a]ny consent, notice and other communication required or contemplated by this Pledge Agreement shall be in writing. If intended for [Silver State and Galaxy] it shall be deemed given if mailed, postage prepaid, to [Silver State and Galaxy] gt [sic] the address given by notice as herein provided. If

intended for [PBCC], it shall be deemed given only if actually received by [PBCC] . . . .

Beginning September 25, 1997, and in connection with the Amended Security Agreement, the Secured Promissory Notes and Pledge Agreements, PBCC filed UCC-1 Financing Statements with the Nevada Secretary of State, the California Secretary of State, and the Recorder for Clark County, Nevada.

On September 19, 1997, Silver State and Galaxy made and delivered to PBCC a Secured Promissory Note in the amount $365,000.00, which Note was fully due and payable on December 18, 1997.

On October 17, 1997, Silver State and Galaxy made and delivered to PBCC an additional Secured Promissory Note in the amount of $110,000.00, which Note was fully due and payable on or before December 2, 1997.

On November 3, 1997, Silver State and Galaxy made and delivered to PBCC an additional Secured Promissory Note in the amount of $253,000.00, which Note was fully due and payable on or before December 3, 1997.

Silver State and Galaxy defaulted on the payments due on each of these loans.

On March 31, 1998, Silver State and Galaxy entered into a Loans Purchase and Sale Agreement with Mountain Community Bank (Mountain Community). Pursuant to the Agreement, Silver State and Galaxy sold 160 Mobile Home Loans, as listed in Exhibit A to that Agreement, to Mountain Community.

Jay Haldeman, the President of PBCC, attended the April 3, 1998, closing of the Agreement between Silver State, Galaxy and Mountain Community. At the closing, PBCC released its security interest in 32 specifically identified Mobile Home Loan Contracts that Silver State and Galaxy sold to Mountain Community. PBCC was paid $766,054 out of the closing escrow as a partial payment of the three defaulted Secured Promissory Notes.

Neither Haldeman nor PBCC were aware that, in addition to the thirty-two Mobile Home Loan Contracts for which PBCC released its security interest, Silver State and Galaxy sold an additional 128 Mobile Home Loan Contracts to Mountain Community as to which PBCC had not released its security interest.

Metropolitan did not offer any evidence that Mountain Community acted without knowledge that the 128 Mobile Home Loan Contracts were subject to a security interest that PBCC had perfected by filing UCC-1 Financing Statements. Rather, Mountain Community had knowledge that the 128 Mobile Home Loan Contracts were subject to a perfected security interest.

On or about April 30, 1998, Mountain Community sold and assigned its rights under the Loans Purchase and Sale Agreement to First Commercial Corporation.

On or about May 1, 1998, First Commercial sold and assigned its rights under the Loans Purchase and Sale Agreement to Metropolitan.

The face value of the Mobile Home Loan Contracts purchased by Metropolitan was approximately $5,900,000. Metropolitan paid First Commercial approximately $4,760,000 (or about 80.25% of the face value of the 160 Mobile Home Loan Contracts).

PBCC did not receive any payment on any of the aforementioned loans until April 6, 1998, when it received a partial payment on those loans as a result of its release of its security interest in thirty-two (32) specifically identified Mobile Home Loan Contracts that were sold by Galaxy Financial and Silver State Mobile Homes to Mountain Community Bank for which PBCC received the amount of $766,054.00.

Pursuant to Article VII of the Loans Purchase and Sale Agreement, which was assigned to Metropolitan, Silver State and Galaxy continued to service the Mobile Home Loan Contracts that were the subject of the agreement and acquired by Metropolitan. Silver State and Galaxy commingled the funds collected on the Mobile Home Loan Contracts with other funds in their general bank account.

Section 8.2 of the Loans Purchase and Sale Agreement provides:

<u>Seller's Repurchase or Substitution Obligation</u>.  If from time to time, any one or more of the Mobile Home Loans become a Defaulted Loan, then Seller, at Seller's election, shall either (i) purchase from Purchaser, without recourse or warranty, at the Repurchase Price, such Defaulted Loan(s); or (ii) replace the Defaulted Loan(s) with substitute Loan(s). . . .  Sellers obligations under this paragraph are absolute and unconditional under any and all circumstances, and shall not be released, relinquished, discharged, impaired, or otherwise affected except by full performance thereof with respect to each Mobile Home Loan. . . .  Seller's obligations hereunder shall be continuing obligations until all Mobile Home Loans and Substitute Loans have been paid in full.  If any Substitute Loan ever becomes a Defaulted Loan, Seller's obligations hereunder to purchase or replace the loan shall extend to such Substitute Loan.

Article 1 of the Loans Purchase and Sale Agreement provides the following definitions:

"Defaulted Loan" or "Defaulted Loans" means one or more of the mobile home Loans that becomes, after the closing date, more than 61 days delinquent. . . ."

"Repurchase Price" means a sum equal in dollar amount to the unpaid principal balance, plus accrued interest, owing on any Defaulted Loan.

"Substitute Loans" means any additional consumer mobile home purchase loans owned by seller as may be acceptable to purchaser, in its sole and absolute discretion, to be substituted for any Defaulted Loans pursuant to the terms and provisions of Article VIII of this Agreement.

Section 8.1 of the Loans Purchase and Sale Agreement provides:

<u>Seller Reserve</u>.  Purchaser shall deduct the Seller Reserve from the cash portion of the Purchase Price to be paid at Closing, and shall deposit the Seller Reserve in the Seller Reserve Account.  Seller hereby grants Purchaser a security interest in the Seller Reserve Account to secure Seller's obligations under this Agreement.

Article 1 of the Loans Purchase and Sale Agreement provides the following definition:

"Seller Reserve" means 5% of the outstanding balance of the Mobile Home Loans (including any Substitute Loans transferred to Purchaser after Closing pursuant to the terms of this Agreement.

From January 1999 through January 2001, Metropolitan required Silver State and Galaxy to repurchase or substitute approximately 194 Mobile Home Loan Contracts pursuant to the terms of the Loans Purchase and Sale Agreement.  During this period, at

6

least 167 Mobile Home Loan Contracts were transferred by Silver State and Galaxy to Metropolitan as Substitute Loans for Defaulted Loans.  Each of these Substitute Loans transferred from Silver State and Galaxy to Metropolitan was subject to PBCC's senior, perfected security interest.

Metropolitan did not give new value to Silver State and Galaxy for any of the 167 Mobile Home Loan Contracts that it received as Substitute Loans.

PBCC did not consent to the transfer of the Mobile Home Loan Contracts to Metropolitan as Substitute Loans, and did not release its security interest in any of the Mobile Home Loan Contracts transferred to Metropolitan as Substitute Loans.

PBCC did not have knowledge of Silver State and Galaxy's transfer of Mobile Home Loan Contracts subject to PBCC's security interest to Metropolitan as Substitute Loans.

Metropolitan did not file a UCC-1 Financing Statement with the Nevada Secretary of State as to any Mobile Home Loan Contract that it received from Silver State and Galaxy, either as part of its receipt of those loans through Mountain Community and First Commercial or directly from Silver State and Galaxy as Substitute Loans.

On June 14, 1999, Metropolitan filed a lawsuit in Nevada State district court against Silver State and Galaxy, as well as Robert Swick, asserting a breach of the Loans Purchase and Sale Agreement.

On October 27, 1999, PBCC sent Silver State and Galaxy a letter declaring them in default pursuant to the terms of the outstanding Secured Promissory Notes, Security Agreement, and Pledge Agreements.

On November 15, 2000, Metropolitan entered into a settlement agreement with Silver State and Galaxy.

On November 27, 2000, PBCC gave written notice to Silver State and Galaxy that, in accordance with the terms of the Security Agreement and the Pledge Agreements, PBCC's collateral would be sold at a public sale on Monday, December 18, 2000, at 1:00 p.m. on

1  the steps of the Clark County Courthouse in Las Vegas, Nevada.  PBCC also published
2  notice of the public sale in the Nevada Legal News, a daily newspaper of general
3  circulation, printed and published in Las Vegas, Nevada, on November 29, 2000,
4  December 6, 2000, and on December 13, 2000.

5  At the request of Silver State and Galaxy, PBCC agreed to postpone the public sale
6  to December 28, 2000, at 1:00 p.m. on the steps of the Clark County Courthouse in Las
7  Vegas, Nevada.  On December 18, 2000, a representative of PBCC appeared and
8  publically announced the postponement of the public sale until December 28, 2000, at 1:00
9  p.m. on the steps of the Clark County Courthouse in Las Vegas, Nevada.

10  Following December 18, 2000, Silver State and Galaxy made further requests to
11  postpone the public sale, and PBCC agreed to postpone the public sale.  For each agreed
12  postponement, a representative of PBCC appeared at the respective date, time, and place
13  then set for the public sale to announce the postponement and the new date, time, and
14  place for the continued public foreclosure sale.

15  On February 7, 2001, in litigation brought by Metropolitan against Silver State and
16  Galaxy, a Nevada State district court signed an Ex Parte Order, which order had been
17  prepared by Metropolitan, appointing George C. Swarts Receiver for Galaxy and Silver
18  State.

19  On February 14, 2001, PBCC conducted a public foreclosure sale of all assets of
20  Silver State and Galaxy.  At the public foreclosure sale, PBCC foreclosed on its security
21  interest and acquired title to all of its collateral under the Security Agreement and Pledge
22  Agreements, including all of the Mobile Home Loan Contracts subject to its perfected
23  security interests, for a credit bid of $1 million.  At that time, Silver State and Galaxy owed
24  PBCC in excess of $5.9 million.

On February 23, 2001, PBCC first became aware that Swarts had been appointed receiver for Galaxy and Silver State.[1]

On March 1, 2001, Metropolitan declared that Silver State and Galaxy had defaulted pursuant to the terms of the settlement agreement in the state court action that Metropolitan brought against these entities, and asserted that Silver State and Galaxy

---

[1] Because it is undisputed that the state court appointed a receiver before the foreclosure sale, the court has relied only upon evidence that is unambiguous as to when PBCC became aware of the appointment of a receiver. The only such evidence is contained within a March 9, 2001, motion for relief from the automatic stay that PBCC filed in the Galaxy and Silver State's bankruptcies. In support of that motion, PBCC offered the declaration of Bernard Hittner, in which he stated that Swarts had been appointed as a receiver on February 7, 2001, and that PBCC "first learned" of the appointment of the receiver and the order appointing the receiver "on or about February 23, 2001."

Conversely, Hittner's cross-examination testimony at trial (and Hittner's deposition testimony upon which Metropolitan's counsel relied at trial) is, at best, ambiguous as to when PBCC became aware that a receiver was appointed. In his February 25, 2003, deposition, Hittner stated, "sometime either in toward the end of 2000 or the first part of 2001 we became aware, I think Greg Hittner who is my brother, I think was up at Galaxy doing something with respect to the collateral, and there was, I think it was a lady that was in the office and we asked who she was and didn't get an answer, and then when we continued to press Bob Swick we found out that there was a receiver who had been put into the premises." Following this answer, Hittner was asked: "Was that before or after your foreclosure sale?" Hittner responded, "Before."

As counsel did not clarify what he meant by "that," and Hittner's cursory answer did not elaborate on what Hittner interpreted "that" to mean, Hittner's answer is ambiguous as to whether Hittner was testifying that "PBCC's awareness" or "the appointment of the receiver" occurred before the foreclosure sale.

Metropolitan did not resolve this ambiguity at trial:
Counsel: "when [Metropolitan's counsel] asked you [at the deposition] 'Was that before or after your foreclosure sale?' and you said before, you're not correcting that testimony now?"
Hittner: No.
Counsel: Did your brother tell you that there was a receiver appointed before the foreclosure sale?
Hittner: I don't know if it was my brother, but I was aware that a receiver was appointed before the foreclosure sale.

Due to counsel's ambiguous questions, Hittner's final answer could mean either what it appears to say, that is, that he "was aware [of the fact] that a receiver was appointed before the foreclosure sale," or it might mean that he "was aware [before the foreclosure sale] that a receiver was appointed before the foreclosure sale."

9

owed Metropolitan the sum of $5,237,503.48, plus interest accruing since February 9, 2001.

On March 2, 2001, PBCC informed Swarts that on February 14, 2001, it had foreclosed its security interest in the business assets of Silver State and Galaxy. On that same date, Swarts filed his report in the Nevada State district court litigation. Swarts' report included his report of PBCC's foreclosure sale and PBCC's assertion that it owned Galaxy and Silver State's assets.

On March 6, 2001, Silver State and Galaxy filed voluntary bankruptcy petitions.

On March 9, 2001, PBCC moved for relief from the automatic stay.

On March 23, 2001, Metropolitan opposed PBCC's motion for relief from the automatic stay.

This court has jurisdiction of the parties and the subject matter.

Pursuant to U.C.C. 9-306(2), "a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

PBCC obtained a perfected first-priority security interest in all of the assets of Silver State and Galaxy by virtue of its various secured financing agreements which were properly perfected by the filing of UCC-1 Financing Statements with the Nevada Secretary of State. These assets specifically included all Mobile Home Loan Contracts. The Mobile Home Loan Contracts constitute "chattel paper" within the meaning of the Uniform Commercial Code.

The Secured Promissory Notes, Security Agreement, and Pledge Agreements did not authorize Silver State and Galaxy to sell Mobile Home Loan Contracts without the written consent of PBCC, regardless of whether such sale was or was not "in the ordinary course" of Silver State and Galaxy's business.

1  The term "ordinary course of business" is not defined within the Secured Promissory
2  Notes, Security Agreement, and Pledge Agreements.
3  The dealings and course of performance of Silver State and Galaxy prior to entering
4  into the Secured Promissory Notes, Security Agreement, and Pledge Agreements do not
5  permit a conclusion that the sale of Mobile Home Loan Contracts was within the "ordinary
6  course of business" of these entities.
7  While Silver State and Galaxy's dealings and course of performance after entering
8  into the Secured Promissory Notes, Security Agreement, and Pledge Agreements indicate
9  that Silver State and Galaxy engaged in the sale of Mobile Home Loan Contracts, Silver
10 State and Galaxy's conduct of such sales establish that such sales were not within the
11 "ordinary course of business."[2]
12 As Silver State and Galaxy's sale of Mobile Home Loan Contracts was not within its
13 ordinary course of business, Silver State and Galaxy's sale of a Mobile Home Loan
14 Contract did not defeat or extinguish PBCC's perfected first-priority security interest in a
15 Mobile Home Loan Contract unless Silver State and Galaxy first obtained PBCC's written
16 consent and release of that security interest.
17 Other than the 32 Mobile Home Loan Contracts for which PBCC specifically and
18 expressly released its security interest on executed Form UCC-2 on or about March 31,
19 1998, each of the remaining Mobile Home Loan Contracts identified in the March 31, 1998,
20 Loans Sale and Purchase Agreement continued to be to PBCC's perfected first priority
21 security interest after their transfer from Galaxy and Silver State to Mountain Community,
22 and subsequently to First Commercial, and subsequently to Metropolitan.

---

[2]  As summarized in the receiver's first report to the state court, Silver State and Galaxy had engaged in the practice of selling the same Mobile Home Loan Contract to two or three different purchasers.  Such improper dealings and course of performance are not within the "ordinary course of business."

Mountain Community had knowledge, or is deemed to have had knowledge, of PBCC's perfected first-priority security interest in the 128 Mobile Home Loan Contracts for which PBCC did not expressly release its security interest.

Metropolitan is a successor to Mountain Community's rights and interests under the Loans Sale and Purchase Agreement. As successor-in-interest to Mountain Community, Metropolitan's rights and interests are no greater than those possessed by Mountain Community at the time Mountain Community, Silver State and Galaxy executed the Loans Sale and Purchase Agreement. As successor-in-interest to Mountain Community, Metropolitan is charged with all actual knowledge of the transaction possessed by Mountain Community and all constructive knowledge attributable to Mountain Community.

Mountain Community had knowledge or is deemed to have had knowledge that the 128 Mobile Home Loan Contracts were subject to PBCC's perfected first-priority security interest. As that knowledge is attributable to Metropolitan, Metropolitan took possession of the 128 Mobile Home Loan Contracts with knowledge that they were subject to a security interest. Metropolitan did not gain a priority interest over PBCC's perfected interest pursuant to U.C.C. §9-308(1).

Silver State and Galaxy did not obtain PBCC's authorization or consent to exchange Mobile Home Loan Contracts to Metropolitan as Substitute Loans for Defaulted Loans. PBCC did not release its security interest in the Mobile Home Loan Contracts that Silver State and Galaxy exchanged with Metropolitan as Substitute Loans for Defaulted Loans.

At all times relevant to this case, other than the 32 Mobile Home Loan Contracts for which PBCC specifically and expressly released its security interest on executed Form UCC-2, Metropolitan's rights and interests in any and all of the Mobile Home Loan Contracts that it received from Silver State and Galaxy, either directly or indirectly through Mountain Community and First Commercial, were subject to PBCC's perfected senior priority security interest.

PBCC provided adequate written notice to Silver State and Galaxy of the public foreclosure sale.

Upon his appointment as receiver over the assets of Silver State and Galaxy, the receiver is deemed to have knowledge of the notice of the public foreclosure sale provided to Silver State and Galaxy, including the publicly announced postponement of the public foreclosure sale to February 14, 2001, at 1:00 p.m., on the steps of the Clark County Courthouse, in Las Vegas, Nevada. The receiver was not entitled to notice beyond that which had previously been provided to Silver State and Galaxy.

Metropolitan was not entitled to receive written notice of the public foreclosure sale pursuant to the provisions of U.C.C. §9-504 and §9504 of the California Commercial Code.

On February 14, 2001, PBCC held a public foreclosure sale of all of the assets subject to its perfected first-priority security interest in full compliance with the provisions of U.C.C. §9-504 and §9504 of the California Commercial Code.

The public foreclosure sale was legally valid and constitutional in all respects.

At the time of the foreclosure sale, PBCC held a perfected, first-priority security interest in the 128 Mobile Home Loan Contracts transferred by Silver State and Galaxy to Mountain Community on or about March 31, 1998, which Contracts Silver State and Galaxy transferred without the knowledge or release of PBCC.

At the time of the foreclosure sale, PBCC did not have a security interest in the 32 Mobile Home Loan Contracts that Silver State and Galaxy transferred to Mountain Community on or about March 31, 1998, with the knowledge of and after obtaining the written release from PBCC.

At the time of the foreclosure sale, PBCC held a perfected, first-priority security interest in each Mobile Home Loan Contract that Silver State and Galaxy transferred after March 31, 1998, to Metropolitan as Substitute Loans.

As the successful bidder at the public foreclosure sale on February 14, 2001, on the steps of the Clark County Courthouse in Las Vegas, Nevada, PBCC became the owner of all of the assets subject to its perfected first-priority security interest, including, without limitation, the 128 Mobile Home Loan Contracts Silver State and Galaxy transferred to Mountain Community without consent or release of PBCC, and each Mobile Home Loan Contract Silver State and Galaxy transferred to Metropolitan as a Substitute Loan in exchange for Defaulted Loans.

Metropolitan's acquisition of the Mobile Home Loan Contracts did not entitle Metropolitan to priority as to any Mobile Home Loan Contract other than the 32 Mobile Home Loan Contracts for which PBCC specifically and expressly released its security interest on or about March 31, 1998.

The face amount of each Mobile Home Loan Contract overstates its actual value. Metropolitan evidenced its determination that the actual value of each Mobile Home Loan Contract was at least 80.25% of the face value when it purchased the portfolio of Mobile Home Loan Contracts for 80.25% of the face value of the Contracts within that portfolio.

From and after April 3, 1998, when Silver State and Galaxy caused an Event of Default under the terms of the Security Agreement with PBCC by transferring 128 Mobile Home Loan Contracts to Mountain Community without the consent of PBCC, PBCC has been entitled to full and complete possession of all assets of Silver State and Galaxy, including without limitation the 128 Mobile Home Loan Contracts, subject to its perfected first-priority security interest.

From and after May 4, 1998, Metropolitan has unlawfully exercised dominion and control, or otherwise interfered with the exercise of PBCC's rights in and to the Mobile Home Loan Contracts that were subject to the perfected first-priority security interest of PBCC, which actions constitute the conversion of each such Mobile Home Loan Contract.

1    PBCC is entitled to recover monetary damages from Metropolitan for each such act
of conversion.  PBCC is entitled to recover $ 3,745,268.55 as monetary damages from
Metropolitan, which amount represents approximately 80.25% of the face value of each of
the 128 Mobile Home Loan Contracts as of May 4, 1998.  PBCC is entitled to recover
interest at the legal rate on this amount from May 4, 1998, through the date of entry of
judgment in this case.

   From and after each date on which Metropolitan received a Mobile Home Loan
Contract from Silver State or Galaxy as a Substitute Loan, in exchange for a Defaulted
Loan, Metropolitan has unlawfully exercised dominion and control, or otherwise interfered
with the exercise of PBCC's rights in and to these Mobile Home Loan Contracts that were
subject to the perfected first-priority security interest of PBCC, which actions constitute the
conversion of each such Mobile Home Loan Contract Metropolitan received as a Substitute
Loan.

   PBCC is entitled to an accounting to determine the amount of monetary damages
owed by Metropolitan for its conversion of each Mobile Home Loan Contract as a
Substitute Loan.  This accounting shall identify each Mobile Home Loan Contract that
Metropolitan received as a Substitute Loan, the face value of each such Mobile Home Loan
Contract on the date Metropolitan received it, an estimated actual value of each Mobile
Home Loan Contract to be computed as 80.25% of its face value on the date Metropolitan
received it, and interest on the estimated actual value of each Mobile Home Loan Contract
at the legal rate to be computed from the date Metropolitan received each such Mobile
Home Loan Contract through the date of entry of judgment.  The accounting shall
determine the total estimated actual value of Mobile Home Loan Contracts that
Metropolitan received as substitute loans, and the total interest accrued on such loans
through the date of entry of judgment.  The accounting shall also determine the total

1  interest accrued at the legal rate regarding the 128 Mobile Home Loans from May 4, 1998,
2  through the date of this judgment.
3      Upon the court's receipt of a report of this accounting, the court will amend the
4  judgment to reflect the monetary value of the damages and interest thereon for conversion
5  of each Mobile Home Loan Contract that Metropolitan received as a Substitute Loan, as
6  well as the interest accrued regarding the conversion of the 128 Mobile Home Loan
7  Contracts.
8      The parties shall, within 10 days of the entry of these Findings of Fact and
9  Conclusions of Law, stipulate to a Special Master to be appointed by the Court to perform
10 the requisite accounting.  Metropolitan shall bear the costs and fees of the Special Master.
11     The Special Master shall, within 30 days of his appointment, file his accounting with
12 the Court.

14 **IT IS SO ORDERED.**
15 DATED this _28_ day of May, 2008.

                                                Lloyd D. George
                                                United States District Judge