1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

## DISTRICT OF NEVADA

9
10  METROPOLITAN BANK AND TRUST
     COMPANY,
11
              Plaintiff,                                  Case No. 2:01-cv-622-LDG (LRL)
12
                                                          **AMENDED JUDGMENT**
     v.
13
     PACIFIC BUSINESS CAPITAL
14  CORPORATION, *et al*.,
15            Defendants.
16  ────────────────────────
17  PACIFIC BUSINESS CAPITAL
     CORPORATION,
18
              Counter-claimant,
19
     v.
20
     METROPOLITAN BANK & TRUST
21  COMPANY,
22            Counter-defendant.
     ────────────────────────
23
             Subsequent to a bench trial, this Court entered judgment in favor of Pacific Business
24
     Capital Corporation on its claim for conversion against Metropolitan Bank & Trust
25
     Company.  Metropolitan appealed.  As to Metropolitan's defense under Uniform
26

Commercial Code (UCC) §9-308(a), the Ninth Circuit held that this Court erred in attributing Mountain Community Bank's knowledge to Metropolitan.  Noting that this court "did not determine whether Metropolitan acted without knowledge of PBCC's security interest with respect to the initial 128 Home Loans or the substitute Home Loans," the appellate court remanded to permit this court to make additional findings.

The Substitution of Loans

In footnote 2 of its decision, the Ninth Circuit stated:

> If Metropolitan can establish on remand a U.C.C. §9-308(a) defense as to the initial 128 Home Loans, the district court may need to reconsider whether Metropolitan gave new value for the substitute Home Loans by releasing security interests in the Home Loans it returned.  *See* Cal. Comm. Code §9105(1)(o); *Nw. Acceptance Corp v. Lynnwood Equip., Inc.*, 1 U.C.C. Rep. Serv. 2d 1710 (W.D. Wash. 1986), *[judgment] aff'd,* 841 F.2d 918 (9th Cir. 1988).

In its brief on remand, Metropolitan argues that "the new value requirement was . . . satisfied when Metropolitan paid $4.74 million (i.e. made an advance) to purchase the Initial Pool and *corresponding rights* under the Mountain Bank Agreement" (emphasis added).  This Court previously found that "Metropolitan is a successor to Mountain Community's rights and interests under the Loans Purchase and Sale Agreement." Metropolitan's rights in the Substitute Home Loans and the Home Loans are governed by the terms of the Loans Purchase and Sale Agreement.

Metropolitan argues that the rights it purchased included "the right to substitute Loan Contracts that Metropolitan was entitled to upon return of defaulted Loan Contracts." Metropolitan concludes that it "did not need to make any additional cash payments to give 'new value' for the substitute Loan Contacts because Metropolitan paid for the right to those Loan Contracts along with its purchase of the Initial Pool plus attendant contract rights in May 1998."

Metropolitan directs the Court's attention to Article 8.2 of the Loans Purchase and Sale Agreement, which provides in full:

<u>Seller's Repurchase or Substitution Obligation</u>.  If from time to time, any one or more of the Mobile Home Loans become a Defaulted Loan, then Seller, at Seller's election, shall either (i) purchase from Purchaser, without recourse or warranty, at the Repurchase Price, such Defaulted Loan(s); or (ii) replace the Defaulted Loan(s) with substitute Loan(s).  In either event Seller shall consummate the transaction within ten days after written demand is made on Seller to do so.  If Seller elects to substitute a Substitute Loan for a Defaulted Loan, Seller shall endorse the note to be substituted, execute such other documents, and take such other actions as would be required if the Substitute Loan were being sold under this Agreement in the first instance. Seller's obligations under this paragraph are absolute and unconditional under any and all circumstances, and shall not be released, relinquished, discharged, impaired, or otherwise affected except by full performance thereof with respect to each Mobile Home Loan.  Purchaser's rights under this paragraph may be assigned by Purchaser to any subsequent buyer of any Mobile Home Loan or Substitute Loan.  Seller's obligations hereunder shall be continuing obligations until all Mobile Home Loans and Substitute Loans have been paid in full.  If any Substitute Loan ever becomes a Defaulted Loan, Seller's obligations hereunder to purchase or replace the loan shall extend to such Substitute Loan.

Article 1 of the Loans Purchase and Sale Agreement provides the following definitions:

"Defaulted Loan" or "Defaulted Loans" means one or more of the mobile home Loans that becomes, after the closing date, more than 61 days delinquent. . . ."

"Repurchase Price" means a sum equal in dollar amount to the unpaid principal balance, plus accrued interest, owing on any Defaulted Loan.

"Substitute Loans" means any additional consumer mobile home purchase loans owned by Seller as may be acceptable to Purchaser, in its sole and absolute discretion, to be substituted for any Defaulted Loans pursuant to the terms and provisions of Article VIII of this Agreement.

Metropolitan's §9-308 defense as to the substitute loans requires a determination whether it purchased the substitute loans for new value by paying for the original chattel paper and a right of recourse.  Section 9-502, and the U.C.C. comments, "recognize[] that there may be a *true sale* of chattel paper although recourse exists."  U.C.C. §9-502 comment 4.  Implicit in this recognition, however, is the further recognition that a chattel

1   paper transaction providing for full recourse, though labeled a sale, may instead be a

2   disguised lending transaction secured by the chattel paper.  Whether a particular

3   transaction was a true sale or a disguised lending transaction becomes significant to

4   determining whether §9-308 governs priority to chattel paper, as §9-308 expressly protects

5   purchasers of chattel paper.  Metropolitan has specifically relied upon its payment for the

6   right of recourse in seeking the protection of §9-308.  Accordingly, the Court must first

7   determine whether the Loans Purchase and Sale Agreement, was a true sale of chattel

8   paper with recourse or was a disguised lending transaction secured by chattel paper.

9        Without doubt, the agreement itself extensively uses terms such as "sale,"

10  "purchase," "Seller," and "Purchaser."  However, "simply calling transactions 'sales' does

11  not make them so. Labels cannot change the true nature of the underlying transactions."

12  *In re Woodson Co.*, 813 F.2d 266 (9th Cir. 1987).  Rather, "whether the parties intended

13  outright sales or loans for security is determined from all the facts and circumstances

14  surrounding the transactions at issue."  *In re Golden Plan of California, Inc.* 829 F.2d 705

15  (9th Cir. 1986).

16       An initial indicator from the Loans Purchase and Sale Agreement is Article 7, which

17  concerns the servicing of the chattel paper.  The Servicing provisions provided Galaxy[1] an

18  opportunity to maintain a relationship with the account debtors.  The Servicing provisions,

19  however, also required Galaxy to open and maintain a Servicing Account into which it was

20  required to promptly deposit payments made by account debtors.  Galaxy had an obligation

21  to use its best efforts to collect payments, as well as an obligation to inform Mountain

22  Community if an account debtor failed to make a payment, or became delinquent for 61

23  days.  Galaxy did not have the right, without Mountain Community's written consent, to

24

25       [1]    The Loans Purchase and Sale Agreement was entered into by Silver State
26  Mobile Homes, Inc. and Galaxy Financial Services, Inc.  For clarity, the Court will refer to
    these entities simply as Galaxy.

4

waive, modify or consent to postponement of any term or provision of any loan.  Mountain Community had an obligation to pay Galaxy a servicing fee of .25% of the unpaid balance of each loan per annum.  Pursuant to Article 7, the parties could agree to terminate Galaxy's servicing obligations or Mountain Community could terminate Galaxy's servicing obligations upon thirty-days' written notice.  Taken as a whole, the terms of Article 7 weigh in favor of finding that the Loans Purchase and Sale Agreement was a true sale.

Article 8, however, weighs much more heavily in favor of characterizing the Loans Purchase and Sale Agreement as a secured lending transaction.  As summarized by the Second Circuit,

> The root of all of these factors is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

The shifting of a risk of loss resulting from an account debtor's default from the assignee to the assignor by means of a contractual guaranty of repayment can indicate that the transaction is "loan" rather than a "sale." *In re Lendvest Mortg., Inc.*, 119 B.R. 199 (9th Cir. BAP, 1990), citing *In re Woodson* and *In re Golden Plan*.

Article 8.2 obligated Galaxy to either pay Mountain Community the entire unpaid balance with accrued interest for each Defaulted Loan or to replace the Defaulted Loan with a Substitute Loan acceptable to Mountain Community in its sole and absolute discretion.  Further, pursuant to Article 8.2, Mountain Community could assign its rights to any subsequent assignee of the Mobile Home Loans or Substitute Loans.  Galaxy's Article 8.2 obligations, by contrast, continued until all Mobile Home Loans and Substitute Loans were paid in full.

1    Also indicative that the Loans Purchase and Sale Agreement is a disguised lending

2  transaction is Article 8.1.  Pursuant to Article 8.1, Mountain Community deducted a reserve

3  of 5% of the cash to be paid to Galaxy at the closing, and deposited the reserve in an

4  account at Mountain Community.  Article 8.1 expressly granted Mountain Community a

5  security interest in this reserve account to secure Galaxy obligations.  Further, pursuant to

6  Article 8.1, Galaxy was obligated to replenish the reserve account if it fell below 5% of the

7  outstanding balance of the Mobile Home Loans and Substitute Loans.  By contrast,

8  Mountain Community's obligation to pay the amount held in reserve to Galaxy was

9  triggered only when the reserve exceeded 6% of the outstanding balance.  As such, the

10  reserve was paid to Galaxy only upon the collection of the unpaid balance of the loans.

11    The recourse provided by Article 8 does not stand alone as suggesting that the

12  Loans Purchase and Sale Agreement is a disguised lending transaction secured by the

13  Mobile Home chattel paper.  In connection with the Loans Purchase and Sale Agreement,

14  Robert Swick was required to execute an Unconditional Continuing Guaranty.  Pursuant to

15  that guaranty, Swick unconditionally guaranteed the full and prompt payment, performance

16  and discharge of all present and future obligations, and liabilities of Galaxy to Metropolitan

17  pursuant to Article 8.

18    Weighing the structuring of the recourse provisions against Galaxy and Swick

19  against the servicing provisions, and considering the entire context of the transaction, the

20  Court has little difficulty concluding that the Loans Purchase and Sale Agreement is

21  properly characterized as a loan secured by chattel paper rather than a true sale.

22    To establish a defense under §9-308, Metropolitan had the burden of establishing

23  that it was a purchaser of the chattel paper.  In its effort to establish that it had paid new

24  value for the Substitute Home Loans, Metropolitan has relied upon its payment to obtain

25  Mountain Community's right of recourse against Galaxy.  Metropolitan purchased that right

26  of recourse in a transaction in which it paid for not only the chattel paper but also for the

1    assignment of Mountain Community's rights under the Loans Purchase and Sale

2    Agreement.  That agreement is properly characterized as a lending transaction.  Unlike

3    Mountain Community's actual knowledge of PBCC's security interest in the chattel paper

4    (which could not be attributed to Metropolitan as a successor to the Loans Purchase and

5    Sale Agreement), Mountain Community's rights under that agreement could be and were

6    (as argued by Metropolitan) assigned to Metropolitan.  Metropolitan did not merely pay for

7    mobile home loans, but paid value for a loan portfolio that included the assignment of the

8    rights and interests in the Loan Purchase and Sales Agreement.  In pointing out that it paid

9    value for the right to substitute loans, Metropolitan has pointed out to the Court that, as to

10   all of the Mobile Home Loans, including those purchased in the original portfolio and the

11   substitute loans, Metropolitan must be considered a lender or creditor rather than a

12   purchaser.  Accordingly, Metropolitan cannot establish a §9-308 defense as to any of the

13   chattel paper.

14   <u>Burden of Proof</u>

15          Assuming that the Loans Purchase and Sale Agreement is not properly

16   characterized as a lending transaction secured by the chattel paper, or that Metropolitan is

17   otherwise considered to be a purchaser of the chattel paper, in the interest of judicial

18   economy the Court will address the issues whether and when Metropolitan took possession

19   of original chattel paper and whether it did so without knowledge of Pacific Business's

20   security interest.  Before addressing these issues, however, the Court must address the

21   burden of proof.

22          As summarized by the Ninth Circuit in its decision:

23          To establish a defense under Uniform Commercial Code (U.C.C.) §9-
             308(a), Metropolitan needed to prove that without its own *actual* knowledge of
24          PBCC's security interest, it (1) gave new value for the mobile home loan
             contracts (Home Loans) and (2) took possession of the Home Loans in the
25          ordinary course of its business.

26

1          Despite the Ninth Circuit's plain statement that, "to establish a <u>defense</u> under

2    Uniform Commercial Code (U.C.C.) §9-308(a), <u>Metropolitan needed to prove</u> that [it acted]

3    without its own actual knowledge of PBCC's security interest," Metropolitan has repeatedly

4    asserted, throughout its arguments to this court on remand, including those made in its

5    brief and during oral arguments to this Court, that Pacific Business "had the burden of

6    proving that Metropolitan had actual knowledge of PBCC's security interest in the specific

7    Loan Contracts. . . ."  Metropolitan's Brief on Remand, at 18.  The Court disagrees.  The

8    Ninth Circuit's direction on this issue is clear: Metropolitan needs to prove that it took

9    possession of the Home Loans, and gave new value, without its own actual knowledge.

10         Metropolitan's reliance upon *Jelmoli Holding, Inc. v. Raymond James Financial*

11   *Services*, 470 F.3d 14 (1st Cir. 2006) is misplaced, and its summary of the holding is

12   incorrect.  In *Jelmoli*, the plaintiff sought to recover funds that its fiduciary had embezzled

13   and then paid to the defendant.  The First Circuit indicated that the general rule created by

14   §3-307 is that "'[m]isuse of the proceeds by the fiduciary is treated as the responsibility of

15   the represented person, who . . . chose the fiduciary,'" and that a narrow exception carved

16   out by §3-307 existed "where there is actual knowledge that one known to be a fiduciary is

17   profiting."  As the general rule placed responsibility for the fiduciary's misuse of funds on

18   the plaintiff (as the party represented by the fiduciary) rather than the defendant, the

19   plaintiff had the burden of proving the defendant's actual knowledge.

20         Metropolitan similarly incorrectly summarizes *Allan v. Diamond T Motor Car Co.*, 291

21   F.2d 115, 118 (10 Cir. 1961).  In *Allan*, the plaintiff and a taxpayer entered into a

22   conditional sales agreement.  The plaintiff then conferred upon the taxpayer "'the usual

23   evidences and indicia of ownership' for the very purpose of enabling [the taxpayer] to deal

24   with the property as its own."  *Id.*  Under the relevant state law, the agreement was treated

25   as a chattel mortgage.  As the agreement was not recorded in the county where the

26   underlying property was located, it had no more effect than an "unrecorded mortgage."

1  The federal government recorded its notice of a tax lien against the taxpayer in the county

2  where the property was located, ultimately seizing and selling the property to satisfy the

3  lien.

4           Although the plaintiff and the taxpayer had entered into the conditional sales

5  agreement prior to the federal tax lien being placed against the taxpayer, the Tenth Circuit

6  noted that "[a] secret agreement between private parties as to the title to personal property

7  is not enough to defeat the enforceability of a federal tax lien." 291 F.2d at 117.  As such,

8  under general priority rules, the earlier, but unrecorded, conditional sales agreement lacked

9  priority against the latter, but recorded, tax lien.  Contrary to Metropolitan's suggestion, the

10 plaintiff had the burden of proving the government had actual notice of its unrecorded lien

11 because the plaintiff was the party seeking a priority exception to avoid the consequences

12 of its failure to properly record the agreement.[2]

13          Accordingly, as stated by the Ninth Circuit, to establish its defense under UCC 9-

14 308(a), Metropolitan must prove that it gave new value for and took possession of each

15 Home Loan or Substitute Home Loan without its own actual knowledge of Pacific

16 Business's security interest.

17 Possession of Home Loans or Substitute Home Loans

18          The Court disagrees with Metropolitan's suggestion that, in its remand, the Ninth

19 Circuit signaled that this Court need not make any determination whether Metropolitan took

20 possession of each Home Loan and Substitute Home Loan.[3]  While Metropolitan argued, in

21 its post-trial brief, that it took possession of the Home Loans, Metropolitan did not direct the

22

23          [2]     The final decision cited by Metropolitan, *Nevada Rock & Sand Co. v. U. S.,*
   *Dept. of Treasury I.R.S.*, 376 F.Supp. 161 (D.C. Nev. 1974), applied the same rule as in
24 *Allan*, citing to *Allan* as authority.

25          [3]     The Court need not, and will not, address whether the Ninth Circuit also
   signaled that findings are unnecessary as to whether Metropolitan was acting in its ordinary
26 course of business, as Pacific Business has not argued that Metropolitan was not acting in
   the ordinary course of its business.

9

1  Court's attention to any evidence establishing when it took possession of the original

2  chattel paper.  Rather, Metropolitan relied upon evidence that "Mountain Community Bank

3  took possession of all of the files and original documents relating to the 160 Contracts that

4  they bought that were eventually sold to Metropolitan."  Just as the knowledge of Mountain

5  Community cannot be attributed to Metropolitan, Mountain Community's act of taking

6  possession of the chattel paper cannot be attributed to Metropolitan.  Accordingly, in

7  considering Metropolitan's §9-308(a) defense, the Court must make findings as to whether

8  Metropolitan took possession of each original chattel paper.

9       Even the most cursory review of the record establishes that the issue as to if and

10  when Metropolitan took possession of each Home Loan or Substitute Home Loan is not

11  straightforward.  Metropolitan purchased the Home Loans from First Commercial in a

12  transaction on May 1, 1998.  More than five months later, however, First Commercial was

13  attempting to obtain possession of the chattel paper for a majority of the Home Loans from

14  Mountain Community Bank, from whom it had bought the Home Loans on April 30, 1998.

15  The record further establishes that over the course of the next few years, Metropolitan was

16  demanding Substitute Home Loans.  While a substantial amount of evidence establishes

17  that loans were exchanged and substituted, Metropolitan's own witness testified that the

18  evidence of substitution did not establish when Metropolitan took possession of the original

19  chattel paper underlying the substituted loans.

20       <u>First Commercial's Possession of Chattel Paper as an Agent of Metropolitan</u>

21       Metropolitan argues that it took possession of the original chattel paper when it

22  allowed First Commercial to retain possession of the original chattel paper.  Metropolitan

23  relies upon §9-305 and *Heinicke Instruments Co. v. Republic Corp*, 543 F.2d 700, 701-702

24  (9th Cir. 1976) for the proposition that possession can occur through an agent or a bailee

25  (once a bailee receives notification of the secured parties' interest).  *Heinicke Instruments*

26  is instructive on this issue: "The notice function of U.C.C. §9-305 would be defeated if the

10

1   debtor, or a person under the debtor's control, were left in possession of the collateral;

2   therefore, perfection will not occur under those circumstances *even if the creditor makes*

3   *the debtor his agent or his bailee*." *Id.*, at 702 (emphasis added).  As defined in §9-

4   105(1)(d), "'Debtor' means the person who owes payment or other performance of the

5   obligation secured, whether or not he or she owns or has rights in the collateral, *and*

6   *includes the seller of accounts or chattel paper*."  (Emphasis added).

7        First Commercial was the seller of the chattel paper to Metropolitan and must be

8   considered a debtor as to the chattel paper.  Accordingly, even if Metropolitan made First

9   Commercial its agent, Metropolitan did not and could not take possession of the chattel

10   paper while First Commercial retained possession of the chattel paper.

11        Metropolitan's Possession of Original Chattel Paper

12        At some point in time after 2001, but more than 18 months prior to the trial,

13   Metropolitan delivered four boxes of files containing chattel paper and titles for mobile

14   homes to its legal counsel.  Judy Herring, a paralegal for Metropolitan's counsel, then

15   maintained custody of those boxes and the files contained in them until the time of the trial.

16   At trial, Metropolitan submitted the four boxes, and all of the files contained in them, into

17   evidence as its Exhibit 79.

18        Metropolitan conceded at trial that it lacks any evidence that it ever took possession

19   of original chatter paper for the Christian/Mitts, Dever/Kendrick, Kelly/Wurster, Marsh and

20   Rono Substitute Home Loans.[4]  Exhibit 80-W includes a concession, by Metropolitan, that it

21   never took possession of the Padilla/Robinson chattel paper.  Metropolitan has not met its

22

23

_____

24        [4]     In its brief on remand, Metropolitan argues that it lacked evidence of original
     chattel paper as to four loans, rather than these five.  Metropolitan ignores the admission at
25   trial of its own witness, Judi Herring.  Herring testified that Metropolitan lacked any
     evidence that it possessed original paper for the Rono loan, and thus that she erred in
26   placing the Rono loan on Exhibit 80-B rather than Exhibit 80-E.

1  burden of showing that it took possession of the chattel paper for these loans and cannot

2  maintain a §9-308 defense as to these loans.

3      The Exhibit 79 file for the Melendez/Palagan Home Loan does not have original

4  chattel paper.  The Exhibit 79 files for the following Substitute Home Loans do not have

5  original chattel paper: Barnum, Blankenship, Boissonneoault, Hubert, Jefferson,

6  Johnson/Coday,  Lugo/Sandoval, Mayse, Porter, Solis, and Voogd.  Although Metropolitan

7  submitted evidence that, it argues, shows it received the original chattel paper,

8  Metropolitan neither produced that original chattel paper at trial nor did it produce evidence

9  that it had delivered the original chattel paper to another person or entity.  Accordingly, the

10  Court finds that Metropolitan did not meet its burden of establishing that it either had

11  possession or took possession of the original chattel paper for any of the loans identified in

12  this paragraph.  Metropolitan cannot maintain its §9-308 defense as to these loans.

13      Pursuant to Metropolitan's Exhibit 80-A, Metropolitan exercised control over the

14  following Home Loans as of February 9, 2001: Alvarado, Berthiaume, Brown (Ethel), and

15  Castro.  Pursuant to Exhibit 80-B, Metropolitan exercised control over the following

16  Substitute Home Loans as of February 9, 2001: Allen, Armstrong, Baca, Baumwoll, Brooks,

17  Buchan/Mallory, Garlington, Gold/McComb, and Stock.[5]  Exhibit 79 lacked any file for these

18  loans.  Metropolitan did not otherwise offer the original chattel paper for these loans into

19  evidence.  Although Metropolitan submitted evidence that, it argues, shows it received the

20  original chattel paper, Metropolitan neither produced that original chattel paper at trial nor

21  did it produce evidence that it had delivered the original chattel paper to another person or

22  

23      [5]      The Court is relying upon Exhibits 80-A and 80-B to identify loans claimed by
   Metropolitan to be in its control in February 2001, but for which a file was not contained in
24  Exhibit 79.  The Court has not attempted to compare Exhibits 80-A and 80-B with either of
   the inventory lists in Exhibit 79.

25      The Court would note, however, that the Exhibit 80-HH inventory list that was
   apparently created and faxed by Metropolitan in 2001 is significantly different from the
26  Exhibit 80-HH inventory list created on February 21, 2007.  The Court could not locate any
   evidence explaining the discrepancy.

1   entity.  Accordingly, the Court finds that Metropolitan did not meet its burden of establishing

2   that it either had or took possession of the original chattel paper for any of the loans

3   identified in this paragraph.  Metropolitan cannot maintain its §9-308 defense as to these

4   loans.[6]

5          Metropolitan met its burden of showing that, at some point in time, it took

6   possession of original chattel paper as to those Home Loans and Substitute Home Loans

7   for which Metropolitan submitted original chattel paper into evidence at trial.  Metropolitan

8   has not offered evidence identifying the specific date on which it received the original

9   chattel paper.  At a minimum, Metropolitan had possession of the original chattel when it

10  sent the Exhibit 79 boxes to its counsel, which was at a point in time more than 18 months

11  before the trial but after this litigation commenced.  While Pacific Business acquired all

12  assets of Galaxy on February 14, 2001, Pacific Business did not become aware that

13  Metropolitan had caused a receiver to be appointed for Galaxy, and did not inform the

14  receiver that it had foreclosed until March 2, 2001.  Nevertheless, the Court finds that

15  Metropolitan must have taken possession of the original chattel paper at some point in time

16  prior to the appointment of the receiver on February 7, 2001.  Absent evidence specifically

17  identifying the date on which Metropolitan took possession of original chattel paper in

18  Exhibit 79, the Court finds that it took possession of the chattel paper on February 6, 2001.

19         Exhibit 80-H includes a spreadsheet generated by First Commercial, in which First

20  Commercial identifies documents relevant to the loans that First Commercial did not

21  possess.  The Padilla/Robinson loan is listed on the Exhibit 80-H spreadsheet.  First

22  Commercial did not indicate documents were missing from the Padilla/Robinson loan and

23  _____

24      [6]      The Court's finding assumes that Exhibits 80-A and 80-B identified all Home
    Loans or Substitute Home Loans over which Metropolitan claimed to exercise control after
25  the last substitution of loans.  If these exhibits are incomplete, the Court's finding extends
    to all Home Loans or Substitute Home Loans over which Metropolitan exercised control
26  after the last substitution of loans in January 2001, for which Metropolitan did not submit
    the original chattel paper into evidence as part of Exhibit 79.

1   did not indicate that the entire file was missing.  In Exhibit 80-W, Metropolitan concedes

2   that, as of September 1999, it never received the file for the Padilla/Robinson loan (which

3   loan it was returning to Galaxy).  Accordingly, even assuming that Exhibit 80-H provides

4   sufficient evidence that First Commercial took possession of original chattel paper that was

5   not identified as missing, the Court will not rely on Exhibit 80-H as evidence that

6   Metropolitan took possession of the original chattel paper from First Commercial for each

7   of the loans identified in Exhibit 80-H.  Nevertheless, the Court finds that Exhibit 80-H

8   establishes that Metropolitan did not take possession of any original chattel paper prior to

9   November 11, 1998.

10          Exhibit 80-GG is a January 23, 2001, letter from Herring to Eric Becker of

11   Metropolitan purporting to forward loan files she had received from Galaxy.  Though the

12   January 23, 2001, letter recites that "original loan files" were enclosed, at least five of the

13   loans submitted into evidence by Metropolitan in Exhibit 79 contained only non-original

14   chattel paper.  Further, Exhibit 79 lacks any file for at least seven of the home loans

15   identified in Exhibit 80-GG.  Metropolitan did not produce any evidence that it had delivered

16   the original chattel paper to another person or entity.  Although the content of Exhibit 80-

17   GG recited that original loan files were forwarded to Metropolitan, Metropolitan failed to

18   either submit the original chattel paper into evidence or submit evidence that the original

19   chattel paper was delivered to another person or entity.  Accordingly, the Court will not rely

20   on Exhibit 80-GG or similar documents (including Exhibits 80-Y, 80-CC, 80-EE) as

21   evidence that Metropolitan took possession of original chattel paper for the loans identified

22   in those documents.

23          Exhibit 80-O is a letter from Galaxy to Metropolitan, in which Galaxy recites that five

24   replacement loans were enclosed.  Exhibit 80-O does not expressly recite that Galaxy was

25   forwarding original chatter paper.  Among the five specifically-identified loans is the loan for

26   Kelly/Wurster.  As noted previously, Metropolitan has acknowledged that it lacks any

1   evidence that it ever possessed original chattel paper for the Kelly/Wurster loan.

2   Accordingly, the Court will not rely on Exhibit 80-O or similar documents that do not

3   expressly recite that original chattel paper is enclosed or being forwarded (including

4   Exhibits 80-N, 80-P, 80-Q, 80-R, 80-S, 80-T, 80-U, 80-V, 80-W) as evidence that

5   Metropolitan had or took possession of original chattel paper for the loans identified in

6   those documents.

7          In Exhibit 80-I, Galaxy acknowledged receiving original chattel paper for the Flores,

8   Moss, Nygard/Aguilar, Margaret Thompson, Shaw/Robert, Brockbank/Clark, Isabel Castillo,

9   Castillo/Sanchez, Duke, Flatt, Fobar, Delfina Garcia, Michael and Angela Garcia, Hustak,

10  Iturralde, Johnson/Green, Legg, Leo/Nuuelua, Lewis, Nakagawa, Nunez, Okazaki,

11  Pedroza/Robinson, Jose Rodriguez, Schofield/Morrison, Schaffer/Newcomb, Soto, and

12  Joyce Thompson Home Loans from Metropolitan.  Metropolitan met its burden of showing

13  that it took possession of original chattel paper for these loans.  As Galaxy received these

14  original documents on July 12, 2000, and absent evidence specific to each of these files

15  establishing the date Metropolitan received the original chattel paper, the Court finds that

16  Metropolitan took possession of original chattel paper for the loans identified in this

17  paragraph on July 11, 2000.

18         In Exhibit 80-I, Galaxy also acknowledged receiving original chattel paper for the

19  Choate/Spieth, Molina-Abrego, Penrod, Brule, Kuhn-Brown, Yim, Barranco,

20  Barrios/Sanchez, Ferguson, Finkelstein, Fisher, Griffen/Winter, Gutierrez, Hockenbraugh,

21  Charles Jackson, Jacobsen, Jenkins, Lester, Lin, Diego Lopez, Jose and Josefina Lopez,

22  Perez/Meeks, Pablo Portillo, Ramirez, Short/Rivera, Soza, Treem, and Turley/Brown

23  Substitute Home Loans from Metropolitan.  Metropolitan met its burden of showing that it

24  took possession of original chattel paper for these Substitute loans.  As Galaxy received

25  these original documents on July 12, 2000, and absent evidence specific to each of these

26  files establishing the date Metropolitan received original chattel paper, the Court finds that

1  Metropolitan took possession of original chattel paper for the loans identified in this

2  paragraph on July 11, 2000.

3      In Exhibit 80-X, Galaxy acknowledged receipt of the original loan documents for the

4  George or Nikki Lee Substitute Home Loan.  Metropolitan met its burden of showing that it

5  took possession of original chattel paper for this loan.  As Galaxy received these original

6  documents in February 2000, and absent evidence specific to this loan establishing the

7  date Metropolitan received original chattel paper, the Court finds that Metropolitan took

8  possession of original chattel paper for this loan on February 28, 2000.

9      In Exhibit 80-DD, Galaxy acknowledged receipt of original loan documents for the

10  Anhder and Terry King Home Loans and the Collins Substitute Home Loan.  Metropolitan

11  met its burden of showing that it took possession of original chattel paper for these loans.

12  As Galaxy received these original documents on May 18, 2000, and absent evidence

13  specific to each of these files establishing the date Metropolitan received original chattel

14  paper, the Court finds that Metropolitan took possession of original chattel paper for the

15  loans identified in this paragraph on May 17, 2000.

16      Exhibit 80-J is a November 13, 1998, letter from Metropolitan in which Metropolitan

17  represents that it is forwarding six original loan files.  The letter recites that the "Original

18  Title" for one of the loans is missing.  The Court finds that the letter sufficiently establishes

19  that Metropolitan took possession, though perhaps briefly, of the Thinnes, Wilson, Cecala,

20  Humphries, Williamson, and Perez (Lazaro) Home Loans.  Absent evidence specific to

21  these loans establishing the date Metropolitan received original chattel paper, the Court

22  finds that Metropolitan took possession of original chattel paper for these loans on

23  November 13, 1998.

24      Exhibit 80-K establishes that, as of December 1, 1998, Metropolitan had not yet

25  taken possession of original chattel paper for the Perez/Meeks loan or the Kuhn-Brown

26  loan.

16

1    Exhibit 80-L is a December 2, 1998, letter from Metropolitan to Galaxy in which

2    Metropolitan represents that it is forwarding the original loan files for five loans.   The Court

3    finds that the letter sufficiently establishes that Metropolitan took possession of the Brown,

4    Landeros, Calley, Ledsworth, and Alvarez Home Loans.  Absent evidence specific to these

5    loans establishing the date Metropolitan received original chattel paper, the Court finds that

6    Metropolitan took possession of original chattel paper for these loans on December 1,

7    1998.

8    Exhibit 80-FF is an August 9, 2000, letter from Judy Herring, a paralegal for

9    Metropolitan's counsel, to Galaxy reciting that as of that date she had in her possession

10   original loan files.  The Court finds that the letter sufficiently establishes that Metropolitan

11   took possession of original chattel paper for the Aguilera and Maslen Home loans.  The

12   Court finds that the letter sufficiently establishes that Metropolitan took possession of

13   chattel paper for the Ellie/Catalano and Prudeaux Substitute Home Loans.  Absent

14   evidence specific to these loans establishing the date Metropolitan received original chattel

15   paper, the Court finds that Metropolitan took possession of original chattel paper for these

16   loans on August 9, 2000.

17   Other than for those loans which the Court has specifically found that Metropolitan

18   took possession, Metropolitan did not meet its burden of showing that it took possession of

19   original chattel paper as to the Home Loans or Substitute Home Loans returned to Galaxy.

20   Metropolitan cannot maintain its §9-308 defense as to any Home Loan or Substitute Home

21   Loan for which the Court has not specifically found that Metropolitan met its burden of

22   showing that it had possession of original chattel paper.

23   Duplicate Originals

24   On February 7, 2001, George Swarts was appointed as a receiver in state court

25   litigation between Metropolitan and Galaxy.  The order signed by the court was submitted

26   by counsel for Metropolitan.  Swarts delivered a report in that litigation on March 2, 2001,

17

which stated *inter alia*: "Galaxy Financial has sold loan portfolios to banks, financial institutions and individuals.  It appears that many of the loans were sold two or three times." To accomplish this, Galaxy regularly engaged in the practice of having its customers sign multiple original sales contracts.  Metropolitan has been aware, since at least March 2, 2001, that Galaxy created duplicate originals for many loans.  Metropolitan's possession of less than all duplicate originals of chattel paper is insufficient to establish priority under §9-308(a).  Galaxy created duplicate originals of the chattel paper for the Dube and Soriano Home Loans.  Metropolitan did not take possession of all duplicate originals of the chattel paper for the Dube and Soriano Home Loans.  Metropolitan cannot establish a defense under §9-308(a) for the Dupe and Soriano Home Loans.

Galaxy created duplicate originals of chattel paper for the Adler, Arreola, John Brown, Bruno/Epps, Cedillo, Darke, Ketring/Yakovich, Whisler, and Robert Williams Substitute Home Loans.  Metropolitan did not take possession of all duplicate originals of the chattel paper for these Substitute Home Loans.  Metropolitan cannot establish a defense under §9-308(a) for these Substitute Home Loans.[7]

As to the remaining loans for which the Court has found that Metropolitan possessed original chattel paper, the present matter presents a circumstance of significant concern whether the Court can find that Metropolitan took possession of all copies of the original chattel paper created for each loan.[8]  As possession of chattel paper allows a buyer the safe harbor of §9-308(a), the risk that a debtor will sell non-duplicate, unmarked

---

[7]    Although Metropolitan did not submit original chattel paper for the Porter Substitute Home Loan into evidence, Pacific Business produced evidence suggesting either that (a) it had possession of the only original chattel paper, or (b) that Silver State and Galaxy also created duplicate original chattel paper for the Porter loan.  In either event, Metropolitan did not meet its burden of establishing that it had original chattel paper for the Porter loan.

[8]    Metropolitan did not offer any evidence that it possessed a duplicate copy or all duplicate copies of original chattel paper for any loan in its portfolio.

1  original chattel paper is attributed to the creditor who neither marks nor takes possession of

2  original chattel paper.  The risk of a debtor selling duplicate originals, however, cannot be

3  attributed to the creditor.  In such a circumstance, the debtor will be creating duplicate

4  originals without the knowledge of the creditor.  Thus, even if a creditor takes care to mark

5  or take possession of original chattel paper for each loan generated by the debtor, the

6  debtor will retain possession of unmarked, duplicate originals that it can sell to one or more

7  purchasers of chattel paper.  The purchaser will purchase duplicate original chattel paper

8  regardless of the actions taken by the creditor with regard to the creditor's interests.  As

9  such, the buyer that takes possession of a duplicate original does so with the risk that the

10  original is a duplicate original.

11      In the present matter, the creation of duplicate originals for the chattel paper

12  generated by Galaxy was not an isolated or uncommon occurrence.  Rather, Galaxy

13  regularly engaged in this practice.  Pacific Business had possession of duplicate originals

14  of original chattel paper possessed by Metropolitan.  Given the evidence received

15  regarding Galaxy's practice of creating duplicate originals, the Court finds that Galaxy

16  created duplicate originals for many, if not all, of the original chattel paper possessed by

17  Metropolitan.

18      Though Metropolitan may not have been aware of this practice when it took

19  possession of original chattel paper, it became aware of the practice on March 2, 2001.  At

20  that time, it received the report of the receiver that it had caused to be appointed in its

21  litigation against Galaxy.  Thus, prior to initiating this litigation against Pacific Business,

22  Metropolitan was aware that it had received original chattel paper from an entity that would

23  create two and three duplicate originals for many loans.  Nevertheless, at trial Metropolitan

24  did not offer any evidence that it had engaged in any effort to establish that Galaxy did not

25  create duplicate original chattel paper of each original chattel paper that Metropolitan

26  possessed and submitted into evidence.  Metropolitan did not show or attempt to show, for

1   any loan, that either a duplicate original was not created or that it possessed all duplicate

2   originals.  Given that Galaxy engaged in a regular and ongoing practice of creating

3   duplicate originals, and the lack of evidence that duplicate originals were not created for

4   other original chattel paper that Metropolitan possessed, the Court cannot conclude that

5   Galaxy did not create duplicate originals of the chattel paper Metropolitan possessed.

6   Rather, the Court must instead find that a duplicate original was created or was highly likely

7   to have been created for each original chattel paper that Metropolitan possessed.

8   Metropolitan did not offer any evidence that it possessed all duplicate originals for any loan.

9   As to the original paper that Metropolitan possessed, Metropolitan neither met its burden of

10  showing that Galaxy did not create a duplicate original of that chattel paper or that

11  Metropolitan took possession of all duplicate originals of that chattel paper.  Accordingly,

12  Metropolitan cannot establish a §9-308 defense as to any Home Loan or Substitute Home

13  Loan as it cannot establish that it took possession of either (a) the only original chattel

14  paper generated by Galaxy or (b) all duplicate originals of chattel paper generated by

15  Galaxy.

16  Metropolitan Obtained Actual Knowledge of Pacific Business's Security Interest

17          Assuming that Metropolitan is a purchaser of the chattel paper, and assuming that

18  Metropolitan took possession of original chattel paper sufficient to satisfy the requirements

19  of §9-308, in the interest of judicial economy the Court will address whether Metropolitan

20  took possession of original chattel paper without knowledge of Pacific Business's security

21  interest.

22          Metropolitan suggests that Pacific Business failed to prove that Metropolitan had

23  already obtained the actual knowledge when Metropolitan took possession of the chattel

24  paper.  The burden of proof, however, rests on Metropolitan.

25

26

Pacific Business Did Not Stamp or Mark The Chattel Paper

Since §9-308 requires a purchaser to take possession of chattel paper without knowledge of a prior secured interest, a prior secured party can protect its interest in the chattel paper by stamping or marking the chattel paper with evidence of the security interest.  As the purchaser must take possession of the chattel paper, the very act of taking possession of marked chattel paper would necessarily convey, to the purchaser, the actual knowledge of the prior security interest.  Conversely, and more important for present purposes, if chattel paper is not marked or stamped, a purchaser's act of taking possession of chattel paper cannot convey actual knowledge of the prior security interest to the purchaser.

Pacific Business did not stamp or mark (or cause Silver State or Galaxy to stamp or mark) any Home Loan or Substitute Home Loan with evidence of Pacific Business's security interest in the chattel paper.  Accordingly, to the extent that Metropolitan took possession of original chattel paper, Metropolitan did not gain its actual knowledge of Pacific Business's security interest through the act of taking possession of that chattel paper.

Actual Knowledge by Other Means

As indicated in the PEB Commentary no. 8, submitted to the Court by Metropolitan, actual knowledge "might come from . . . a statement by the debtor, the secured party, or third parties" in addition to marked paper.

On February 25, 2002, Pacific Business requested Metropolitan to admit that "[s]ince at least April 15, 1998 METRO has had knowledge of PBCC's security interest in all of the CHATTEL PAPER of GALAXY and SILVER STATE."

By response dated March 27, 2002, "Metropolitan admitt[ed] that at some point in time Metropolitan obtained knowledge of PBCC's alleged security interest in the chattel paper of Galaxy and Silver State.  Metropolitan is conducting an investigation of employees

21

1   and former employees to determine the approximate date upon which Metropolitan learned

2   of PBCC's alleged security interest, and Metropolitan will promptly supplement its response

3   for this Request for Admission when the true facts are ascertained."  Metropolitan never

4   supplemented its admission to indicate the approximate date when it learned of Pacific

5   Business's security interest.

6       Pacific Business's request for admission was expressly directed at its security

7   interest in "all of the CHATTEL PAPER of GALAXY and SILVER STATE," which would

8   necessarily include the chattel paper that Metropolitan acquired.  Accordingly, Metropolitan

9   acknowledged obtaining actual knowledge of Pacific Business's security interest in all

10  chattel paper of Galaxy, which would include the chattel paper that Metropolitan acquired.

11      Metropolitan argues, correctly, that while its response shows that it knew of Pacific

12  Business's security interest in the chattel paper as of May 15, 2001 (when this suit was

13  filed),[9] its response does not show that Metropolitan knew of Pacific Business's security

14  interest in the chattel paper as of the dates when Metropolitan took possession of Home

15  Loans or Substitute Home Loans.  Metropolitan's response, however, also does not show

16  that it gained its actual knowledge after taking possession.  As Pacific Business requested

17  Metropolitan to admit it had knowledge as of at least April 15, 1998, and as Metropolitan

18  responded that it obtained actual knowledge at some point in time, Metropolitan obtained

19  actual knowledge at some point in time between April 15, 1998, and May 15, 2001.

20      As Metropolitan obtained knowledge at "some point in time" between April 15, 1998,

21  and May 15, 2001, Metropolitan had the burden of showing that the "point in time" when it

22  obtained that knowledge was after it took possession of the chattel paper.  James Taylor,

23  _____

24      [9]     Metropolitan argues, alternatively, that its response shows knowledge as of
        March 27, 2002, the date on which it responded.  As noted by Metropolitan, however, both
25      dates are subsequent to the last date on which it took possession of any Home Loan or
        Substitute Home Loan.  Accordingly, the analysis is essentially the same regardless of
26      whether the response shows that Metropolitan had knowledge by May 15, 2001, or by
        March 22, 2002.

22

on behalf of Metropolitan, made a due diligence visit to Galaxy in April 1998, and visited directly with Swick.  Taylor acknowledged, at a minimum, gaining knowledge from Swick that Galaxy had a floor planning line of credit financing relationship with Pacific Business. Taylor reviewed loan files and documents at Mountain Community, but could not recall whether or not he reviewed financial information on Galaxy.  Pacific Business had delivered to Mountain Community a copy of its UCC-1 filing, a Form UCC-3, and a payoff demand. Metropolitan did not show that these documents were not in Mountain Community's files regarding the Galaxy transaction, and did not show that Taylor did not review these documents during due diligence.  Rather, Taylor acknowledged that he made notes and was sure there was a file with Metropolitan regarding due diligence.  Metropolitan did not produce that file.  Metropolitan did not meet its burden of showing that it did not obtain actual knowledge through Taylor in April 1998.

Metropolitan's relationship with Galaxy did not begin and end with its due diligence visit to Galaxy in April 1998.  Beginning in November 1998, Metropolitan began communicating with Galaxy regarding Home Loans and Substitute Home Loans.  The relationship with Metropolitan deteriorated until Metropolitan initiated litigation against Galaxy in June 1999.  Galaxy disclosed its security agreements with Pacific Business to Metropolitan in the litigation in October 1999.  Metropolitan did not meet its burden of showing that it did not obtain actual knowledge as of October 1, 1999, as a result of the disclosure of documents by Galaxy.

In sum, while Metropolitan obtained knowledge at some point in time between April 15, 1998, and May 15, 2001, Metropolitan did not show when it gained actual knowledge during the period between April 15, 1999, and May 15, 2001.  As Metropolitan may have received that knowledge either before or after it obtain possession of original chattel paper,

1  Metropolitan did not meet its burden of showing that it took possession of the chattel paper

2  without actual knowledge.

3  <u>Relinquishing Interests in Returned Loans is Not New Value on Substitute Loans</u>

4      The Court has carefully reviewed *Northwest Acceptance Corp. v. Lynnwood Equip.,*

5  *Inc.,* 1 U.C.C. Rep. Serv. 2d 1710 (W.D. Wash. 1986).[10]  As indicated by the district court's

6  decisions, including that reported at 1 U.C.C. Rep. Serv. 2d 980, on 23 accounts, the seller

7  sold equipment to a buyer, which equipment was collateral for the seller's indebtedness to

8  an inventory financier.  The seller sold the chattel paper to a bank for new value, and the

9  bank took possession of the chattel paper.  The seller then repossessed the equipment.

10  The district court ruled that the bank had an unperfected security interest in the

11  repossessed equipment that was in the possession of the seller, which security interest

12  was senior to the inventory financier's perfected security interest in the equipment.  The

13  district court then ruled that, in two different circumstances, the bank retained a priority

14  interest in chattel paper subsequently transferred from the seller to the bank as proceeds of

15  the bank's interest in the equipment: "(a) when the equipment securing paper was sold to a

16  new purchaser and generated new chattel paper; and (b) when the interest in collateral

17  was exchanged for other chattel paper."  In a subsequent decision, the district court also

18  adopted the bank's alternative rationale that, under the second circumstance, the bank

19  obtained priority by giving new value, which new value was its "relinquishment of any claim

20  in the first piece of equipment."

21      In *Northwest Acceptance*, the seller had, in its inventory, repossessed equipment

22  encumbered by the bank's security interest.  The seller also owned chattel paper it had

23

24      [10]    Although the district court's decision at 1 U.C.C. Rep. Serv. 2d 1710 is
reported as having been affirmed by 841 F.2d 918 (9th Cir. 1988), the latter decision

25  addressed *only* the borrower's appeal of the district court's grant of a partial summary
judgment in favor of Northwest Acceptance, rather than Northwest Acceptance's appeal (if

26  such an appeal ever occurred) of the district court's decision in favor of a chattel paper
holder.

generated by selling other equipment.  The seller transferred this "other chattel paper" to the bank in exchange for the bank's release of the bank's security interest in the repossessed equipment in the seller's inventory.  As a result of this exchange, the seller could resell the repossessed equipment unencumbered.  The district court determined that the release of the bank's security interest in repossessed equipment in the seller's inventory constituted new value for the chattel paper in other equipment.

This matter presents distinguishable facts precluding a determination that Metropolitan's release of its interests constituted new value for the substitute loans.  While Galaxy owned chattel paper generated by the sale of other mobile homes, Galaxy's inventory did not include repossessed mobile homes encumbered by Metropolitan's security interest.  As such, Metropolitan could not and did not have a security interest in any repossessed mobile homes in Galaxy's inventory.  Rather, Metropolitan held chattel paper previously generated by Galaxy, which chattel paper evidenced a monetary obligation of account debtors and a security interest in mobile homes possessed by the account debtors.  Metropolitan argues that it gave new value by giving up its possession of the chattel paper, its rights in the underlying collateral securing the chattel paper, and its rights of collecting the monetary obligation evidenced by the chattel paper.  As chattel paper is defined, in §9-105, as a "writing or writings which evidence both a monetary obligation and a security interest in underlying collateral," Metropolitan's argument amounts to nothing more than admitting that the "new value" it gave for the substitute chattel paper was the returned chattel paper.  Without dispute, Metropolitan released its possession of returned chattel paper, but it did so in exchange for Galaxy releasing its possession of substitute chattel paper.  Metropolitan released its rights in the collateral underlying the returned loans, but it did so in exchange for Galaxy releasing its rights in the collateral underlying the substitute loans.  Metropolitan released its rights to collect the monetary obligations evidenced by the returned loans, but it did so in exchange for Galaxy releasing

1   its rights to collect the monetary obligations evidenced by the substitute loans.  As

2   Metropolitan and Galaxy exchanged chattel paper for chattel paper, an obligation for an

3   obligation, the exchange of chattel paper (including each separate underlying exchange of

4   corresponding rights and interests and each separate exchange of corresponding

5   relinquishments of rights and interests) cannot support a finding that Metropolitan gave new

6   value for the Substitute Home Loans.

7   <u>Metropolitan's Monetary Payments</u>

8        Metropolitan also argues that it gave new value by paying a monetary sum when the

9   value of a substituted loan exceeded the value of the returned loan.  Lawrence Wickter

10  testified that there "may have" been instances where Metropolitan wrote a check to Galaxy

11  to compensate for a difference in value.  Trial Tr. 87:14-19.[11]  Wickter did not identify any

12  specific substitute loan for which Metropolitan paid a monetary sum to compensate for the

13  value of the unpaid principal of the substituted loan exceeding the value of the unpaid

14  principal of returned loan.  Lloyd Bell testified that it was his understanding that, in some

15  cases, Metropolitan would transmit money to Galaxy as part of the substitution process.

16  Bell did not identify any specific substitute loan for which Metropolitan paid a monetary sum

17  to compensate for the value of the substitute loan exceeding the value of the returned loan.

18       In support of its argument, Metropolitan relies upon Wickter's testimony regarding

19  the letter admitted as Exhibit 80-W.  Exhibit 80-W, however, is evidence that Metropolitan

20  did <u>not</u> make cash payments to Galaxy for at least four loan substitutions in which the

21  value of substituted loans exceeded returned loans by $38,649.30.  Rather, as to two loan

22  substitutions, Metropolitan accepted substitute loans whose value was less than returned

23

24       [11]    Metropolitan asserts, in its briefs, that Wickter testified that Metropolitan paid
    the difference "often" or on "numerous occasions."  Metropolitan does not cite to any
25  testimony that supports this assertion.  Rather, Wickter's only testimony regarding cash
    payments was that it may have happened, and that it "may be that [Metropolitan] did that a
26  few times."

1   loans.  Metropolitan then instructed Galaxy to net the amount Galaxy owed Metropolitan

2   against the amounts Metropolitan owed Galaxy as a result of prior substitutions.  While

3   Exhibit 80-W recites that Metropolitan still owed Galaxy $3,006.25, neither Exhibit 80-W

4   nor any other document or testimony establish that Metropolitan ever paid this amount to

5   Galaxy (rather than retaining the funds to set off future amounts that Galaxy would owe

6   Metropolitan).

7        Lacking any evidence that Metropolitan made a cash payment to Galaxy for a

8   specific substitute loan, the Court cannot enter a finding as to any specific substitute loan

9   that Metropolitan gave new value for that specific substitute loan by making a cash

10  payment.

11       The Court has previously addressed Metropolitan's argument that it paid new value

12  for the substitute loans with its purchase of the Mobile Home Loans and the attendant

13  contract rights.  The Court has concluded that the purchase of those recourse rights, along

14  with the reserve and the unconditional guarantee of Robert Swick, requires that the original

15  agreement be characterized as a financing transaction rather than a sale, precluding

16  Metropolitan from maintaining a §9-308 safe harbor defense as to all loans, whether in the

17  original portfolio or taken in substitution.

18       **THEREFORE,** for good cause shown, **THE COURT ORDERS** that it re-affirms its

19  judgment in favor of Pacific Business Capital Corporation in the amount of $17,605,108.47,

20  with post-judgment interest accruing from the date of entry of that judgment.

21

22  DATED this ___ day of March, 2011.

23

24                                                    _____
                                                      Lloyd D. George
25                                                    United States District Judge

26